IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 2:10CR00017 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **JIMMY SCOTT ELKINS,** ) | By: James P. Jones |
| ) | United States District Judge |
| Defendant. ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Nancy Dickenson, Assistant Federal Public Defender, and Thomas M. Gray, III, Graduate Fellow, Office of the Federal Public Defender, Abingdon, Virginia, for Defendant.*

In this criminal case, the defendant has moved to dismiss the Indictment on the grounds that the prosecution against him violates the Second Amendment. For the reasons that follow, I will deny the defendant's motion.

I

The defendant, Jimmy Scott Elkins, is charged in a one-count Indictment with possessing firearms while subject to a domestic protective order, in violation of 18 U.S.C.A. § 922(g)(8) (West 2000). He has moved to dismiss the Indictment on constitutional grounds, arguing that criminal prosecution under the statute violates his Second Amendment rights as established in *District of Columbia v.*

*Heller*, 554 U.S. 570 (2008). The government opposes the motion, which has been subject of an evidentiary hearing and briefing and is ripe for decision.

II

According to the evidence presented at the hearing on the present motion, the defendant once had a romantic relationship with Heather Vanover, with whom he had a child, although he is now married to someone else. In April of 2010, Vanover complained about Elkins to the local sheriff, alleging that Elkins held her against her will, assaulted her, and threatened her with a nine-millimeter handgun. The defendant was arrested and eventually convicted of simple assault.

Under Virginia law, an individual may petition a state court for a protective order when the individual feels endangered by a "family or household member," which definition includes an individual who has a child in common with the petitioner. Va. Code Ann. § 16.1-228 (2010). A protective order may direct a variety of things, including ordering the alleged abuser to stop abusive or threatening behavior and prohibiting the alleged abuser from contacting the petitioner. One type of order is the preliminary protective order, which may be issued ex parte. Va. Code Ann. § 16.1-253.1(A) (2010). The order can be in effect for no more than 15 days. Va. Code Ann. § 16.1-253.1(B) (2010). A petitioner may also seek a regular protective order, which can be in effect for up to two years.

Va. Code Ann. § 16.1-279.1(B) (2010).  A regular protective order is issued only after a "full hearing" in which the petitioner has proved the allegations of family abuse by a preponderance of the evidence.  Va. Code Ann. § 16.1-253.1(D) (2010). "Family abuse" is defined as "any act involving violence, force, or threat including, but not limited to, any forceful detention, which results in bodily injury or places one in reasonable apprehension of bodily injury and which is committed by a person against such person's family or household member."  Va. Code Ann. § 16.1-228.

Vanover obtained preliminary protective orders against Elkins on April 22 and June 28, 2010.  Thereafter, on July 9, 2010, Vanover sought a regular protective order after Elkins followed her with a firearm.  At the hearing on the petition, at which Elkins was present, the state judge determined that Vanover had shown by a preponderance of the evidence that family abuse had occurred.  The resulting protective order explicitly required Elkins to refrain from committing further acts of family abuse and to have no contact with Vanover and two other individuals.  The order was directed to remain in effect until July 13, 2012.

Late on November 22, 2010, Elkins and his wife, Jennifer Lee Elkins, began an argument over his relationship with Vanover, during which Elkins allegedly made threats and stated that "they would have to take [him] out."  His wife and children fled.  Elkins fired several rounds outside of the house from different AK-

47 assault rifles and barricaded himself inside. The police were summoned and officers surrounded the residence. After negotiations, Elkins surrendered about 5:00 A.M. the next day. He was arrested on a charge of reckless handling of a firearm and released on bond later that day.

Several hours later, Elkins allegedly entered his parents' residence, again made threats against family members, and destroyed property within the residence. The police were again called. The defendant was arrested and when police searched Elkins's residence, they found the firearms referenced in the Indictment.

Section 922(g)(8), enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401, 108 Stat. 1796, 2014-15 (1994), criminalizes the possession of a firearm in interstate commerce by a person who is subject to a court order that

> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C) (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

18 U.S.C.A. § 922(g)(8). An "intimate partner" is defined to include an individual who is a parent of a child of the person, or who has cohabitated with the person. 18 U.S.C.A. § 922(a)(32) (West 2000).

In the present case, the Indictment charges that the domestic protective order issued against the defendant contains the terms described in § 922(g)(8)(C)(ii), rather than those set forth in subsection (C)(i).

III

The Second Amendment to the Constitution, part of the Bill of Rights, provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.[1] In *Heller*, the Supreme Court found for the first time that the right to keep and bear arms is an individual right, without regard to militia service, and invalidated District of Columbia laws that banned the possession of handguns and required citizens to keep firearms in inoperable condition. 554 U.S. at 635. In its opinion, the Court noted that the right is not unlimited, and that its holding did not invalidate "presumptively lawful regulatory measures," *id.* at 627 n.26, such as

---

[1] James Madison introduced the proposed Bill of Rights into Congress on June 8, 1789. Congress passed the Bill of Rights later that year and sent the amendments to the states for ratification. Virginia ratified the Bill of Rights on December 15, 1791, and the amendments became part of the Constitution. Comm'n on the Bicentennial of the U.S. Constitution, *The Constitution of the United States* 37.

"longstanding prohibitions on possession of firearms by felons and the mentally ill," *id.* at 626. Since *Heller*, defendants have asserted that various statutes criminalizing firearm possession run afoul of their Second Amendment rights, and the courts have struggled to analyze the constitutionality of such provisions.[2]

In determining the constitutionality of the prosecution against Elkins, I am of course bound not only by *Heller*, but also by published decisions of the United States Court of Appeals for the Fourth Circuit.

In *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit heard a challenge to a related statute, 18 U.S.C.A. § 922(g)(9) (West 2000), which criminalizes firearm possession by those who have been convicted of domestic violence misdemeanors. There, the court explained its two-part approach to determining the merits of a Second Amendment challenge. *Id.* at 680. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* This is a historical inquiry that requires looking at whether the conduct at issue was understood to be within the scope of the right at the time of ratification. *Id.* If the conduct is within the scope of the right, then the second part of the two-part analysis applies. *Id.*

---

[2] As Judge Wilkinson recently noted (albeit in a context different from the present issue) in describing the hesitancy of lower courts to extend *Heller* beyond its specific holding: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States v. Masciandaro*, No. 09-4839, 2011 WL 1053618, at *17 (4th Cir. Mar. 24, 2011).

The second part involves the application of the appropriate form of means-end scrutiny. *Id.*

A

Under the two-part approach, the first question is whether § 922(g)(8) burdens or regulates conduct that comes within the scope of the Second Amendment. The relevant conduct is possession of firearms by individuals subject to domestic restraining orders that meet the requirements of the statute. The court in *Chester* was unsure that felons, a class recognized by the Supreme Court as being subject to longstanding prohibitions, fell outside the scope of the Second Amendment.[3] *Id.* at 680-81. It then reasoned, "If the historical evidence on whether felons enjoyed the right to possess and carry arms is inconclusive, it would likely be even more so with respect to domestic-violence misdemeanants." *Id.* at 681. Under this precedent, even felon-in-possession laws, which have existed for most of the last century, would likely receive some form of heightened constitutional scrutiny and would not be declared constitutional based on the total inapplicability of the Second Amendment.

---

[3] The Fourth Circuit has interpreted the "presumptively lawful" statement in *Heller* to mean that the listed types of governmental interests might be sufficient to withstand Second Amendment challenges. *Id.* at 679; *see United States v. Masciandaro*, 2011 WL 1053618, at *10.

Like the statute in *Chester*, the statute here was enacted in 1996, more than two centuries after the ratification of the Bill of Rights, and several decades after the enactment of felon-in-possession laws. No facts have been produced to show that the drafters of the Second Amendment contemplated that domestic violence restraining orders would exist, let alone cause an individual to lose his rights. There is insufficient historical evidence to conclude that the Second Amendment does not provide some protection for individuals who are subject to domestic protective orders.

The government nevertheless argues that the defendant's conduct was completely outside the scope of the protections afforded by the Second Amendment because Elkins, as a person who was determined to be dangerous by a court of law, is a member of a class of persons that has historically been prohibited from possessing firearms. I find, however, that the government has failed to show that those who have been determined to be dangerous by a court of law make up a historically unprotected class. The government cites laws from England and the colonies prior to the American Revolution to show that people who may have been considered dangerous could be disarmed. For instance, colonial governments disarmed those who refused to take an oath of loyalty and those who were involved in a public assault or fight. The government also cites proposals made during the creation of Second Amendment that would have withdrawn protection under the

amendment if there was a real danger of public injury or if individuals were not peaceable.

Despite this historical evidence, the government has not shown the existence of a consistent recognition of an excluded class of dangerous individuals. Many of the examples provided are both too broad and too narrow to define the unprotected class as those who are determined to be dangerous, and references to "peaceable" citizens or those who were involved in "affrays" do little to support the precise argument that a finding of dangerousness eliminated protection.

For these reasons, I find that the conduct alleged here falls within the scope of the Second Amendment.

B

The second part of the two-part approach is to apply an appropriate form of means-end scrutiny. The Supreme Court in *Heller* expressly avoided deciding what level of scrutiny should be applied when reviewing a law burdening the right to keep and bear arms, but it did make clear that rational basis did not apply, 554 U.S. at 628 n.27. Other circuits faced with challenges to § 922(g)(8) have split as to the proper standard. *Compare United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (applying strict scrutiny), *with United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny).

Although the Fourth Circuit has not determined the particular standard to apply, it has instructed that the level of scrutiny to apply depends on the character of the Second Amendment question presented. *Masciandaro*, 2011 WL 1053618, at *11. Appropriate considerations include the nature of the Second Amendment interest, the extent to which those interests are burdened, and the strength of the government's justification for the regulation. *Id.* The core Second Amendment interest is the ability of a law-abiding citizen to possess a firearm for protection in the home. *Chester*, 628 F.3d at 676, 683.

In *Chester*, the Fourth Circuit determined that intermediate scrutiny applied because, as a result of his criminal history, the defendant's asserted right was not core to the Second Amendment. *Id.* at 683. Additionally, where a statute prohibiting the possession of loaded firearms in national parks was in question, intermediate scrutiny applied because, although the defendant was a law-abiding citizen, the criminal conduct did not occur in the defendant's home. *Masciandaro*, 2011 WL 1053618, at *12.

Here, the factors weigh in favor of applying intermediate scrutiny. First, the nature of the interest at issue is not core to the Second Amendment. Although Elkins was not convicted of any crime leading to his dispossession, a court of law found in a formal proceeding that it was more likely than not that he had committed an act of family violence. Second, the statute does not result in

complete and permanent dispossession of affected individuals. Although the restriction deprives certain individuals of the ability to possess any firearms, the deprivation is only temporary. Based on these considerations, the burden on the defendant's protected Second Amendment interest is not of a character that would require the application of strict scrutiny. Therefore, intermediate scrutiny applies.

C

Intermediate scrutiny requires the government to establish the existence of a reasonable fit between an important government goal and the statute's restrictions. *Chester*, 628 F.3d at 683. I find that the government has met that burden.

First, there is no question that the government has a substantial interest in preventing gun violence, including violence within the home. *See United States v. Smith*, 742 F. Supp. 2d 855, 867 (S.D.W. Va. 2010). Second, the government has shown a reasonable fit between this goal and the restriction imposed. Empirical or sociological data is unnecessary to show the relationship between the restriction and the goal of reducing gun violence.[4] The procedural and temporal limitations imposed are sufficient to establish the requisite reasonable fit.

---

[4] In *Chester*, the court remanded the case because the government failed to carry its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and the statute's permanent dispossession of all domestic violence misdemeanants. 628 F.3d at 683. The court held that the government failed to show evidence showing the relationship between the restriction on firearm possession and the governmental goal of reducing violence. *Id.* Because the statute disarmed all domestic

Unlike the limitation in *Chester*, which permanently disarmed those convicted of a misdemeanor crime of domestic violence, regardless of the likelihood that an individual would be violent or dangerous during the period of dispossession, § 922(g)(8) applies only when a court has issued a specific injunction against the defendant. While the protective order here does not include an explicit finding that Elkins represented a credible threat, when Congress enacted the statute, it was legislating against the background of the rule of American law that for an injunction to issue there must be a likelihood that irreparable harm will occur. *Emerson*, 270 F.3d at 262. Therefore, a court will only issue a protective order if there is sufficient basis to do so. *See United States v. Miles*, 238 F. Supp. 2d 297, 302 (D. Me. 2002). The statute here requires that evidence was presented to show a real threat to danger of injury to the protected party. *See Emerson*, 270 F.3d at 262.

There are explicit limitations on Virginia courts to ensure the restriction applies only in appropriate circumstances. First, the restriction only applies when allegations of family abuse have been proven by a preponderance of the evidence in a court of law. Va. Code Ann. §16.1-253.1(D). Second, courts may only prohibit contact with a petitioner or her family or household members if the prohibition is necessary to protect the health and safety of those persons. Va. Code

---

violence misdemeanants, the court presumably sought evidence tying the fact of a past domestic violence conviction to a greater likelihood of future gun violence.

Ann. § 16.1-279.1(A)(2) (2010). Third, protective orders may not be issued for a period longer than two years. Va. Code Ann. § 16.1-279.1(B). Therefore, unlike the statute barring domestic violence misdemeanants from possessing firearms, § 922(g)(8) does not deprive individuals of their right to bear arms long after occasions of family abuse occurred.[5] These limitations ensure that only people who currently pose a threat of violence are restricted, providing a reasonable fit between the restriction and the government's interest in reducing domestic violence.

Upholding the statute is consistent with decisions from other circuits, including cases where strict scrutiny was applied. *See, e.g.*, *Emerson*, 270 F.3d at 261 (applying strict scrutiny); *Miles*, 238 F. Supp. 2d at 301 (applying strict scrutiny but not explicitly holding that strict scrutiny is necessary); *Reese*, 627 F.3d at 804 (upholding the statute under intermediate scrutiny but noting that it would also be valid under strict scrutiny); *United States v. Luedtke*, 589 F. Supp. 2d 1018 (E.D. Wis. 2008) (upholding the statute under an analogizing approach but noting that it would also be valid under strict scrutiny analysis).

Like all individual rights guaranteed by the Constitution, the right to possess firearms for protection in the home is not unlimited. The prosecution of Elkins under the statute here does not cross a constitutional line.

---

[5] In Elkins' case, of course, the protective order had only been in effect for a few months when he allegedly violated § 922(g)(8).

IV

For the foregoing reasons, it is hereby **ORDERED** that the defendant's Motion to Dismiss the Indictment on Constitutional Grounds (ECF No. 29) is DENIED.

ENTER: May 2, 2011

/s/ James P. Jones
United States District Judge